IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

SHIRLEY ANNETTE MARTIN,        )
                                )
                                )
v.                              )   No. 1:12-cv-00042
                                )   Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION  )

To: The Honorable John T. Nixon, Senior Judge

REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405 (g) and 1383 (c) to obtain judicial review of the final decision of the Social Security Administration ("SSA"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental security income ("SSI") under Title XVI of the Social Security Act. This case is currently pending on plaintiff's motion for a judgment on the administrative record (Docket Entry No. 13), to which defendant has responded. (Docket Entry No. 16) The plaintiff subsequently filed a reply to the defendant's response. (Docket No. 17) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11)[1], and for the reasons given below, the Magistrate Judge recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

I.  Introduction

Plaintiff filed her DIB application and SSI application on October 21, 2008, alleging disability onset as of July 1, 2006. (Tr. 10) On December 19, 2008, these applications were denied at the initial level of review before the state agency. On February 17, 2009, the

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

applications were again denied on reconsideration before that agency. Id. Plaintiff thereafter filed her request for de novo hearing of her claim to benefits by an Administrative Law Judge ("ALJ") of the SSA's Office of Disability Adjudication and Review. Id. On August 23, 2010, the plaintiff appeared with counsel and testified at a hearing in front of ALJ Barbara Kimmelman. (Tr. 27-63) Testimony was also received from an impartial vocational expert. Id. The ALJ issued a decision on October 4, 2010 finding that plaintiff was not disabled under the Social Security Act. (Tr. 10-22) The decision contained the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant has not engaged in substantial gainful activity since July 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bipolar disorder and chronic tension type headaches (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). She can lift twenty-five (25) to thirty (30) pounds occasionally and ten (10) pounds frequently. She can stand and/or walk for eight (8) hours in an eight-hour day, and sit eight (8) hours in an eight-hour day. She can perform simple and detailed routine, repetitive tasks. She must avoid contact with the public and have only occasional contact with co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 19, 1971, and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Id. Plaintiff filed a request to the Appeals Council of the SSA and the Appeals Council denied the plaintiff's request to review the ALJ decision on March 28, 2012 (Tr. 1-5), thereby render the decision the final decision of the SSA. Plaintiff timely filed this civil action for judicial review of the ALJ's October 4, 2010 decision and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383 (c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

### A. Medical Evidence

Plaintiff alleges she suffers from racing thoughts, crying spells, feelings of being overwhelmed, paranoia, anger, sleeplessness, and other mental or emotional symptoms. (Tr. 307-11) She has a history of treatment for bipolar disorder. She also alleges frequent migraines. Id.

According to the records at Centerstone Community Mental Health Center ("Centerstone"), the plaintiff has been treated by nurse practitioner Kari E. Reeves, M.S.N. and is currently seeing psychiatrist Jack Koomen, M.D. (Tr. 245-633, 655-99) On April 17, 2006, plaintiff participated in an intake session at Centerstone. The intake therapist, Barbara Conrad, L.P.C.-M.H.S.P recommended that plaintiff have a medication evaluation and participate in

individual therapy. (Tr. 307-11) The record does not contain any individual therapy notes, which would indicate that plaintiff did not follow up with Ms. Conrad's recommendation.

Plaintiff has been prescribed numerous psychotropic medications and changes have been made at nearly every visit in either dosage or type of drug. Plaintiff testified that these medications have provided some relief in the past two years or so. (Tr. 29-56) Plaintiff has frequently complained to Ms. Reeves and Dr. Koomen of being unable to sleep, but has often refused to take prescribed medications that make her drowsy. (Tr. 309, 321, 327, 354, 406, 437, 466, 528, 679)

On August 11, 2010, she also complained to neurologist Suresh Chitturi, M.D. that she could not sleep, but admitted that she drinks "at least 10 cups of coffee a day." (Tr. 766) The plaintiff testified that she spends most of her day sleeping, but later testified that she sleeps "maybe an hour" at night and does not sleep during the day. (Tr. 29-56) In a Function Report from November 2008, plaintiff stated that she "[doesn't] sleep a lot," but later in the report listed sleeping as one of her hobbies and stated that she considered her "sleeping all of the time" unusual behavior. (Tr. 173-80)

Although plaintiff's global assessment of function ("GAF") score has indicated more severe problems in the past, she has not had a GAF score of less than 50 since her alleged disability onset date and her limitations have been no more than moderate. (Tr. 245-53) The CRG assessment completed approximately three months after plaintiff's alleged onset date states that she has no limitations in any of the four areas of functioning which are activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 248-50)

Plaintiff testified that her adult daughters live with her because they are afraid to leave her alone because of her past suicide attempts. (Tr. 45) She reportedly was hospitalized for suicidal ideation in 2002 or 2003, but no hospital records were contained in the file and the hospitalization was apparently based on the plaintiff's report. (Tr. 302, 304) Plaintiff also indicated that she had attempted suicide two or three years prior to the hearing (2007 or 2008), but no record of this was provided and the plaintiff's attorney was unaware of this alleged attempt until the plaintiff testified at the hearing. (Tr. 45-46)

With regard to the plaintiff's problems with anger and frustration, plaintiff testified that she yells at her family and had assaulted her son two days prior to the hearing for what she acknowledged was a minor infraction. (Tr. 52) She testified that she goes grocery shopping either late at night or early in the morning because she had once became so frustrated that she hit a woman in the grocery store. Id. She also testified at the hearing that she quit her job as a CNA because she had hit a co-worker for getting in her face and decided she should no longer work around people. (Tr. 50) The treatment record indicated she reported walking off from one job because she wanted to hit her manager (Tr. 309), but there is no report in the treatment notes of an altercation with a coworker, at least in the relevant time period. Nonetheless, earlier in the hearing, the plaintiff stated that she had left the job as a CNA because the person she cared for died and she can no longer do that kind of work because of arthritis in her right shoulder. (Tr. 37-38) There was no evidence in the file of arthritis. Id.

Plaintiff testified that she had last worked as a cook and that she quit when her bipolar disorder had morphed into physical symptoms. (Tr. 34-35) She stated that she felt better after a few days and decided that it was because she had not been working. (Tr. 35)

Plaintiff alleged that she has schizophrenia. The record does not, at least within the relevant time period, contain any such diagnosis. Plaintiff has complained to Ms. Reeves and Dr. Koomen sporadically that she has auditory hallucinations such as a baby crying (Tr. 563), and visual hallucinations in the form of shadows. (Tr. 303) Plaintiff testified that she has hallucinations at night in the form of seeing people and hearing voices including that of her deceased mother, and that she "feels things touching" her. (Tr. 53) Plaintiff has been prescribed medication to treat these symptoms. (Tr. 563-68)

In addition to plaintiff's mental conditions, plaintiff alleges she is disabled due to migraine headaches. (Docket Entry No. 13-1) On January 29, 2007, plaintiff reported in a consultative examination with Darrel R. Rinehart, M.D. that she had had migraine headaches since she was twelve, but that she had "learned to live with those." (Tr. 737-40) Dr. Rinehart noted that plaintiff had no signs or symptoms of a headache the day of his evaluation. He further stated, "Mrs. Martin gives a history mostly of psychiatric disorder. She states that this is really the only reason that she is not able to work." Id.

On June 29, 2010, plaintiff reported to Dr. Chitturi that she has had headaches since the age of twelve, but for the two to three months prior to that appointment, she had been experiencing two headaches per week. (Tr. 762) Dr. Chitturi's examination indicated that plaintiff was alert, awake, and oriented times three, with intact language and speech. He assessed fair attention and concentration, intact recent and remote memory, a fair fund of knowledge, euthymic mood, and mood congruent affect. Id. The entire physical neurological exam was normal, including examinations of her extremities, neck and shoulders. (Tr. 763) She exhibited a normal gait and station, with normal deep tendon reflexes throughout. Dr. Chitturi diagnosed chronic tension type headache, and prescribed Topamax with a follow-up in four

6

weeks. Id. He also ordered a CT of her head which indicated "negative intracranial examination." (Tr. 765)

At plaintiff's follow-up examination with Dr. Chitturi, which took place on August 11, 2010, it was noted that plaintiff had improvement with frequency and severity of her headaches. (Tr. 766-67) The CT of her head was normal, and the rest of her exam was normal as before. Id. Dr. Chitturi started her on nortriptyline, and recommended she continue taking the magnesium and vitamin B2, as well as Naprosyn as needed since she had problems with Topamax. Dr. Chitturi noted that plaintiff did not need to return to see him for two months. Id. Plaintiff testified that her headaches have decreased in frequency from two or three per week to one or two per week as a result of taking the medication. (Tr. 49)

Dr. Chitturi also completed a medical source statement in August of 2010 regarding the plaintiff's physical limitations due to her headaches. (Tr. 721-25) Dr. Chitturi indicated that the plaintiff has approximately two headaches per week and eight per month. (Tr.722) Specifically, Dr. Chitturi opined that the plaintiff will require unscheduled breaks once or twice a week for one to two hours where she will need to sit quietly; she will likely be off-task for 15% of the workday due to her symptoms interfering with her attention and concentration; and she will likely be absent from work about three days per month due to her impairments or treatment. (Tr. 724)

Dr. Rinehart stated in January 2007 that plaintiff "has also had a little bit of shoulder discomfort, but that really does not limit her, she states." (Tr. 737-40) Dr. Rinehart further stated that, "based purely on sitting, standing, lifting, and walking, I think that she should be able to do these things up to 8 hours in a workday," and "she should be able to lift 25-30 lbs. moderately over the same period of time" Id.

7

The record does indicate that plaintiff complained of shoulder pain on July 19, 2007, to personnel at Maury Regional Ambulatory Care when she reported that she was working two jobs which required the use of her hands. (Tr. 227) Plaintiff complained to Ms. Bryan on October 5, 2009, of neck, shoulder, and back stiffness and was diagnosed with a cervical strain (Tr. 704) No further diagnostic testing is contained in the record nor are there any ongoing complaints of back, neck, shoulder, arm, or hand pain. There is no objective evidence of arthritis and no record of a diagnosis or treatment for arthritis or any musculoskeletal complaint that lasted for 12 continuous months. (*See* Tr. 38-39)

Medical source statements were submitted by plaintiff's treating psychiatrist, Dr. Koomen, dated July 13, 2010 (Tr. 714-20), and August 25, 2010. (Tr. 768-69) Dr. Koomen indicated that plaintiff had Bipolar I Disorder and severe Axis IV psychosocial and environmental issues. (Tr. 714-20) He further stated that the plaintiff had undergone medication monitoring since 2002 with variable results from trials of multiple antidepressants, mood stabilizers, and anti-anxiety medications, and that she was unlikely to recover from her chronic major psychological disorder. (Tr. 715) However, the remainder of the responses from the two opinions was reportedly based upon the responses of the plaintiff and her husband. These responses included multiple marked limitations in areas of mental functioning which would preclude competitive work activity. (Tr. 30)

The record reflects that plaintiff is not always compliant with taking her medications as prescribed, but there are reports of medications helping her symptoms. (Tr. 19) There is also a notation in the treatment record in June 2009 suggesting that Dr. Koomen had been notified of "restrictions" regarding controlled drugs, including "early refills, lost/stolen replacements, multiple prescribers/pharmacies, and other irregularities." (Tr. 678)

B.  Non-Medical Evidence

Plaintiff was 35 years old on her alleged disability onset date and has a high school equivalent education, as she obtained her GED.  (Tr. 21, 34)  The plaintiff testified that she had to quit her last job working in a kitchen due to difficulties with her psychological and mental impairments.  (Tr. 34-36) Plaintiff reported babysitting four children in February 2008, and the record reflects she was still caring for children at least through October 2008.  (Tr. 16)

As for plaintiff's activities of daily living, plaintiff reported on a Function Report in November of 2008 that she was physically able to tend to her personal needs but indicated that she often lacks the motivation.  (Tr. 173-80)  Plaintiff stated in that report that her adult daughters, who live with her, generally do all of the housework.  Id.  However, she documented that she prepares a full meal each night and is able to drive.  She reported that in the past she enjoyed reading and doing jigsaw puzzles, but now all she wants to do is sleep.  She shops for groceries, but tries to go early in the morning or late at night.  She also occasionally eats dinner out with her family.  She stated that she no longer attends church and does not socialize at all including not attending family reunions. She testified that she is uncomfortable in crowds and often has anxiety or panic attacks when she goes out.  Id.  However, she gave convoluted testimony regarding attending a concert at a large arena in Nashville in March of 2010.  (Tr. 41-44)

C.  Vocational Expert Testimony

A vocational expert (VE) attended and testified at plaintiff's hearing.  (Tr. 56-62) The ALJ asked the VE to opine whether there were jobs for an individual of plaintiff's age and education if she would be "limited to lifting a maximum of 25 to 30 pounds, that she could sit, stand and/or walk for up to six hours each in an eight hour work day, she would be limited to

9

simple and detailed routine repetitive tasks, she should avoid working with the public and only occasionally have contact with co-workers." Id. The VE testified that such a person could perform the job of bulker - tobacco industry 522.687-018, of which there are 5,700 such jobs in Tennessee and 74,000 in the U.S.; and housekeeper - cleaner 323.687-014 (which includes the jobs day worker – domestic 301.687-014 and laundry worker - domestic 302.685-010), of which there are 8,029 such jobs in Tennessee and 203,750 in the U.S. Id.

### III. Conclusions of Law

#### A. Standard of Review

This Court reviews the final decision of the SSA to determine whether the SSA's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support an alternative conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Anthony v. Astrue, 266 Fed. Appx. 451, 456 (6th Cir. 2008).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In the proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process. The Sixth Circuit Court of Appeals described the process as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment. If the claimant is significantly limited by a nonexertional impairment, the SSA's burden can only be carried when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used

to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments including: mental and physical; exertional and nonexertional; and severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff contends that the ALJ erred by not properly evaluating and assessing the credibility of the plaintiff's statements; by not giving proper weight to the opinion of the plaintiff's treating physician; and by failing to properly evaluate the medical opinions of record and failing to resolve significant inconsistencies between the opinions and her residual functional capacity finding.

Plaintiff contends that the ALJ did not properly evaluate and assess the credibility of the plaintiff's statements. (Docket Entry No. 13-1 at 8) It is the role of the ALJ to resolve conflicts within the evidence. Buxton v. Halter, 246 F.3d 762, 775 (6th Cir. 2001). The ALJ's findings based on credibility are to be accorded great weight. Martin v. Comm'r of Soc. Sec., 170 Fed. Appx. 369, 373 (6th Cir. March 1, 2006).

An ALJ can find a claimant's statements less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical records or reports show that the individual is not following the treatment as prescribed without good reasons for the failure. SSR 96-7p. The ALJ noted that the plaintiff did not always follow up with doctor's recommendations and does not receive recommended case management services. (Tr. 15) The ALJ determined the plaintiff's lack of medical compliance makes it unclear how helpful the medication is for some of her symptoms (Tr. 17)

The plaintiff claims to be very limited in her ability to work and be around others. However, the CRG assessment completed approximately three months after the plaintiff's alleged onset date indicates that she has no limitations in any of the four areas of functioning which are activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 15, 248-50) Further, the plaintiff cooks a full meal every night and is able to tend to her personal needs and help out with housework when she has the motivation to do so. (Tr. 13) She can go grocery shopping and she occasionally goes out to dinner with her family. Id. She claims she is unable to control her anger, but she reported babysitting four children in February 2008 to at least October 2008. (Tr. 16) Further, the record does not indicate that she has ever been charged with assault, despite her citing of numerous alleged altercations. Id.

The plaintiff claims she is no longer able to go to church because of her alleged disability, but she went to a concert at Municipal Auditorium in 2010 where she sustained an injury as a result of being jostled in a crowd. (Tr. 19) The ALJ determined that the plaintiff's explanation about her attendance at the concert was not entirely credible as it was not consistent with her reports of her injury when she sought care. Id.

13

The plaintiff also had conflicting testimony about why she left her job as a CNA. (Tr. 17) She claimed the person she cared for died and she had not done any similar work since then because of arthritis in her right shoulder. There was no evidence of the arthritis in the file. However, the plaintiff later testified that she left her job after an altercation with a co-worker. She claimed this made her realize she did not need to be around people. Again, the ALJ acknowledged these reports were inconsistent and not wholly credible. Id.

The plaintiff also had numerous inconsistencies regarding her sleeping habits. (Tr. 16) In 2008, the plaintiff filled out a Function Report claiming that she didn't "sleep a lot," but later called sleeping a "hobby" and claimed her "sleeping all of the time" was unusual. (Tr. 173-80) Her testimony and statements to doctors also provided inconsistencies with regard to alleged impairment-related sleeping problems. (Tr. 16) In one appointment where she claimed to be having problems sleeping, she admitted to drinking at least ten cups of coffee a day. Id.

An ALJ is allowed to weigh the evidence as a whole against the plaintiff's statements regarding her symptoms. SSR 96-7p. Based on the inconsistencies in the plaintiff's statements and reports, the ALJ determined the plaintiff was not wholly credible. (Tr. 10-22) Thus, the undersigned concludes that the ALJ gave specific reasons for finding plaintiff's testimony not wholly credible and supported that finding with evidence in the case record. Further, the ALJ's findings are sufficiently specific to make clear the weight given to plaintiff's statements and the reasons for that weight.

The medical opinion of a treating physician is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and is not substantially opposed on the record. Even where the opinion is not entitled to controlling weight, the Sixth Circuit has stated that there remains a rebuttable presumption that the opinion

14

of a treating physician is entitled to great deference. Rogers v. Comm'r of Soc. Sec., 486 F. 3d 234, 242 (6th Cir. 2007). A treating physician is a physician who provides or has provided a claimant with medical treatment or evaluation and who has or has had an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502. Generally, a relationship will be considered to be ongoing if a claimant has seen the physician with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for the claimant's medical condition. Id. Depending on the circumstances and the nature of the alleged condition, two or three visits may not be sufficient for an "ongoing treatment relationship." Kornecky v. Comm'r of Soc. Sec., 167 Fed. Appx. 496, 507 (6th Cir. February 9, 2006).

The ALJ is to "evaluate every medical opinion" submitted in light of a variety of listed factors, which include the nature of the treatment relationship, the supporting medical basis for the opinion, and overall consistency with the larger record. 20 C.F.R. §§ 404.1527(d); C.F.R. 416.927. The regulations also set out a presumptive sliding scale of deference to be given to various types of opinions. Id. An opinion from a treating physician is entitled to the most deference by the SSA because of the "ongoing treatment relationship" between the patient and the opining physician. Norris v. Comm'r of Soc. Sec., 461 Fed. Appx. 433, 439 (6th Cir. 2012) (quoting Smith v. Comm'r of Soc. Sec., 482 F. 3d 873, 875 (6th Cir. 2007)). A non-treating source, who physically examines the patient, but has never had an "ongoing relationship" with the patient, falls next along the continuum. Id. A non-examining source, who has provided an opinion based solely on review of the patient's existing medical records, falls last on the continuum. Id.

The ALJ gave no weight to the opinion of treating neurologist Dr. Chitturi. She explained her rejection as follows:

15

Neurologist Suresh Chitturi, M.D., also submitted a medical source statement regarding the claimant's physical limitations due to her headaches which was written on August 17, 2010. However, the claimant had only seen Dr. Chitturi twice prior to that date, on June 29, 2010, when the claimant reported experiencing two headaches a week for the prior two to three months, and she reported they lasted from hours to days. Dr. Chitturi examined the claimant and found that she was alert, awake, and oriented times three, with intact language and speech. He assessed fair attention and concentration, but intact recent and remote memory, a fair fund of knowledge, the claimant's mood was euthymic, and affect was mood congruent. The entire physical neurological exam was normal, including examinations of her extremities, neck and shoulders. She exhibited a normal gait and station, with normal deep tendon reflexes throughout. Dr. Chitturi diagnosed chronic tension type headache, and prescribed Topamax with a follow-up up in four weeks. At the follow-up on August 11, 2010, Dr. Chitturi noted the claimant reported some improvement in her headache frequency and severity, though she said she could not tolerate Topamax. Instead she was daily taking magnesium oxide and Vitamin B2, and Naprosyn as needed. She also reported she was drinking at least 10 cups of coffee a day, as she reported problems with her sleep. The CT of her head was normal, and her exam was normal as before. Dr. Chitturi recommended that she cut back on coffee gradually and completely stop it. In addition, he started her on nortriptyline, and recommended she continue taking the magnesium and vitamin B2, as well as Naprosyn as needed. She was instructed to return in two months. The evidence does not reflect that the claimant sought treatment or complained of headaches for a period of 12 continuous months during the relevant time period, but there is a diagnosis and she is given the benefit of the doubt regarding the existence of headaches, but not the frequency or severity.

Dr. Chitturi's medical assessment does not appear to account for the improvement he reported the claimant made between those two visits. His statement indicate the limitations are due to "chronic tension type headaches", which the record as a whole does not show impacted the claimant on a regular or frequent basis, and he only classifies her headaches as moderate in intensity. Presumably this would be without medications and without consideration of the improvement the claimant reported in frequency and severity, because he indicated that she would have two headaches a week and eight per month, and that the approximate duration of a typical headache would be more than 24 hours. Dr. Chitturi indicated that medication makes the claimant's headaches better, and did not indicate anything else was needed to make her headache better. Specifically he indicated no need to lie down, find a quiet place or dark room, or apply hot or cold packs. However, he also indicated that she would need to take breaks and sit quietly for one to two hours once or twice a week at unscheduled times. Further, his assessment also contains other contradictions within the document. For instance, he states that the claimant is "capable of moderate stress- normal work" but then says she will have to take one to two unscheduled breaks while at work for one to two hours each, as noted above. He indicates she will likely be absent about three days a month as a

result of her chronic headaches, and that she would be "off task" about 15 percent
of the time while at work. The record as a whole does not support that the
claimant would require such accommodations for headaches based on severity
and frequency, and not for a period of 12 continuous months, especially if she is
compliant with medications. For these reasons, no weight is given to the opinion
of Dr. Chitturi.

(Tr. 19-20) Further, the plaintiff told Dr. Rinehart that she had "learned to live with [the headaches]." The medical source statement submitted by Dr. Chitturi contained contradictions within it and conflicted with the record as a whole. It was based on only two prior visits with the client and appears to be based on the plaintiff's alleged symptoms before she began taking medication for the headaches. Id.

The ALJ considered information provided by the plaintiff's treating psychiatrist, Dr. Koomen, such as the plaintiff's GAF scores, in assessing the plaintiff's alleged disability. (Tr. 15) However, the ALJ chose to give no weight to the two medical source statements (Tr. 715-20, 768-69) submitted by Dr. Koomen. (Tr. 19) The ALJ noted that the medical source statements submitted by Dr. Koomen clearly indicated that he answered the questions by interviewing the plaintiff and her husband about what the plaintiff's limitations were, and recording their responses on the assessment forms. The ALJ opined that neither of the medical source statements provided by Dr. Koomen was entitled to any weight given the fact they did not reflect an actual assessment by Dr. Koomen. Id. See also Coldiron v. Comm'r of Soc. Sec., 391 Fed. Appx. 435, 441 (6th Cir. August 12, 2010) (The ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation); 20 C.F.R. §§ 404.1527(a)(2), C.F.R. 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s)…"; 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (In order for a treating physician's opinion about the nature and severity of a

17

person's impairment to be given controlling weight, it must be "well supported by medically acceptable clinical and laboratory techniques" and "not inconsistent with the other substantial evidence in [the] case record").

The ALJ also did not provide any weight in her decision to the assessment of nonexamining consultant Dr. Phay. The ALJ actually did not mention the psychiatric review technique form and the mental residual functional capacity assessment form completed by Dr. Phay (Tr. 741-58) in her decision. However, the ALJ did consider a 2008 evaluation by the state agency physician, Dr. Joslin, which described the exact same functional limitations as found by Dr. Phay except that restriction on daily living was listed as mild instead of moderate in the 2008 evaluation. (Tr. 13) Ultimately, in considering plaintiff's activities of daily living, the ALJ appropriately found that mild limitations were supported by and consistent with the opinion of the state agency physician, and the record as a whole, including the plaintiff's admitted activities, such as babysitting four children. Id.

The ALJ accorded significant weight to the medical opinions of Dr. Joslin and Dr. Rinehart. (Tr. 20) Dr. Joslin's opinion included moderate limitations in the plaintiff's ability to perform at a consistent pace without interruptions, and to respond to changes in the work setting appropriately. (Tr. 651) These limitations were accounted for in the RFC by limiting the plaintiff to "routine, repetitive tasks." Based on the social limitations provided by Dr. Joslin, the RFC limited the plaintiff to jobs that "avoid contact with the public and have only occasional contact with co-workers." (Tr. 14) The ALJ properly considered all of the evidence of record in determining plaintiff's residual functional capacity.

Between the medical opinions, treatment records, and testimonial evidence, the record is conflicted. However, the ALJ's resolution of the conflict after a detailed discussion of

18

the medical treatment of plaintiff's symptoms and plaintiff's reports of her symptoms is sufficiently supported to be sustained under "substantial evidence" review. The undersigned finds that the ALJ's credibility finding -- due significant deference on judicial review, Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003) -- is substantially supported; that good reasons were given for the rejection of Dr. Chitturi's opinion and medical source statement of Dr. Koomen and, that the finding of the plaintiff's RFC was properly determined and presented to the vocational expert, resulting in sufficient evidence with which the ALJ satisfied her step five burden of showing a significant number of jobs in the economy that plaintiff could be expected to perform despite her impairments. Accordingly, the undersigned concludes that the SSA's decision to deny benefits should be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

**ENTERED** this 6th day of June, 2014.

                                                        s/ John S. Bryant
                                                       JOHN S. BRYANT
                                                       UNITED STATES MAGISTRATE JUDGE